UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
TONYA MALONE,                   )
                                )
          Plaintiff,            )
                                )
v.                              )        Civil Action
                                )        No. 15-13831-PBS
CAROLYN W. COLVIN,              )
Commissioner of Social          )
Security Administration,        )
                                )
          Defendant.            )
                                )
```

**MEMORANDUM AND ORDER**

February 24, 2017

Saris, C.J.

**INTRODUCTION**

Plaintiff Tonya Malone, who has a history of pain and
mental health issues, seeks review of the denial of her claim
for Social Security disability benefits, arguing that the
Administrative Law Judge ("ALJ") erroneously failed to consider
the opinion of an examining consultative orthopedist and
disregarded the findings of state agency psychologists that she
has moderate limitations in social functioning that required a
"supportive employer." Because the ALJ failed to sufficiently
explain why he discredited the opinion of the examining
consultative orthopedist, the Court **ALLOWS** Malone's motion to

1

vacate and remand the decision of the Commissioner (Docket No. 19) and **DENIES** the Commissioner's motion to affirm (Docket No. 20).

## FACTUAL BACKGROUND

Malone applied for Disability Insurance Benefits on August 14, 2012, claiming disability due to coccydynia, hernia, fibromyalgia, right hand arthritis, migraine headaches, obesity, bipolar disorder, depression, and anxiety. Malone claimed that her disability began on August 28, 2011. Malone was forty-eight years old when the ALJ denied her application on July 24, 2014.

Malone worked most recently as a dual-diagnosis counselor at a Long Island shelter. R. 33. Prior to that, Malone worked as a nursing assistant. R. 33. Malone attended high school through the eleventh grade. R. 32. She did not pursue a GED, but she did complete a nursing assistant program and receive a certificate. R. 32-33.

## I.  Physical Health Conditions

### A.  Chronic Pain

Malone's medical record contains frequent references to back pain, abdominal wall pain, and whole body pain dating back to 1998. E.g., R. 271, 307, 440, 455.

A January 22, 1998 evaluation by Dr. Godwin Darko referenced complaints of knee pain and middle and upper back pain. R. 271. A February 18, 1998 radiology consultation by Dr.

2

Daniel O'Connor referenced a history of headaches, neck, and back pain stemming from an injury one year prior. R. 275. Dr. O'Connor found no evidence of fracture, tissue swelling, or abnormality. R. 275.

After slipping and falling on water on June 6, 2000, Malone sought treatment from Dr. Crowley, an emergency room physician, for neck and back pain. R. 295.

On August 10, 2006, Malone sought treatment for abdominal pain at the incision site of a tubal ligation six years prior. R. 307. Dr. Andrew Glantz performed an incisional hernia repair and located two incisional hernias at the site of the past incision. R. 307. During a follow-up visit on September 25, 2006, Dr. Glantz described Malone as "fully recovered" from the hernia surgery. R. 311.

On June 2, 2008, Malone was injured in a car accident. R. 321. The next day, she went to the emergency room and reported nausea, headache, body aches, and migraine. R. 321. On June 25, 2008, Malone sought treatment from her primary care physician, Dr. Kathleen Crowley. R. 321. Dr. Crowley indicated that while Malone reported that she did not feel better, the mechanism of her injury was unclear. R. 321.

On September 14, 2012, Malone sought treatment from Dr. Thomas Ostrander. R. 455. Dr. Ostrander described Malone as

having a history of "chronic pain" with headaches and abdominal wall hernia with cramping. R. 455.

Two weeks later, on September 28, 2012, Malone sought a behavioral health evaluation from Social Worker Judith Bello. R. 499. During the appointment, Malone reported pain in her back, neck, knees, shoulder, head, and tailbone. R. 500. Malone rated the pain intensity as an eight on a pain intensity scale of one to ten. R. 500.

On November 7, 2012, Malone had a follow-up appointment with Dr. Ostrander. R. 490. Malone conveyed during the office visit that the "pain continues." R. 490.

On November 14, 2012, during a therapy appointment with Psychotherapist Stephanie Freeman, Malone reported pain in her head and stomach that rated eight out of ten on a ten-point pain scale. R. 424. On the same date, Malone was also evaluated by Dr. Anna L. Fitzgerald. R. 440. Dr. Fitzgerald noted that Malone suffered from "chronic pain." R. 440.

On December 5, 2012, during a therapy appointment with Freeman, Malone reported constant whole-body pain of high intensity (ten on a pain scale of one to ten). R. 412. Freeman's notes indicated, "[Patient] reported she is still experiencing a great amount of physical pain and medication is not relieving the pain." R. 413. During Malone's next psychotherapy appointment on December 19, 2012, Malone again reported pain of

ten out of ten with constant pain in her stomach and head. R. 464. A few weeks later, on January 9, 2013, Malone reported physical pain at a severity of four out of ten. R. 417. Malone again reported physical pain during a January 16, 2013 therapy session, with a severity of five out of ten. R. 450.

Malone returned for a follow-up with Dr. Ostrander on February 25, 2013. R. 429. The treatment record described Malone as having a history of "chronic pain" with codeine "no longer working for her pain." R. 429. Malone was diagnosed with Chronic Pain Syndrome and prescribed Fentanyl pain patches. R. 431.

At an office visit on March 27, 2013 with Dr. Ostrander, Malone reported that morphine was "working well" to control her pain. R. 473.

Dr. Anne Fitzgerald evaluated Malone on April 24, 2013, at which point Malone reported pain of a ten out of ten. R. 485. At the appointment, Malone reported that she had been prescribed morphine for her hernia and pain. R. 484. Malone expressed wariness of narcotics due to her history but deemed the morphine "necessary." R. 484. Dr. Fitzgerald noted that "pain persists but improved with current treatment." R. 487. At a psychotherapy appointment on the same day, Malone noted "constant head, back, and stomach pain over the course of two weeks." R. 495. On August 6, 2013, Malone sought treatment from Dr. Daniel Cottrell, her new primary care physician, for chronic pain,

abdominal pain, and headaches. R. 513. Malone reported she could "barely move" and was "unable to walk long distances." R. 513.

On September 30, 2013, Malone sought treatment from Dr. Cottrell for increased hip and back pain. R. 509. Treatment notes referenced "chronic pain -- Fibromyalgia." R. 509. No cause, trauma, or injuries were reported. R. 509. Dr. Cottrell noted that "pain is worse of late for unclear reasons" and that "she is very concerned about opiates and worries about addiction." R. 511. Malone was prescribed Percocet. R. 511.

On October 3, 2013, Dr. Cottrell submitted a medical report to the Massachusetts Disability Evaluation Services stating that Malone had "chronic pain, fibromyalgia" that would affect her ability to work for more than a year. R. 538, 542. Dr. Cottrell stated that Malone was prescribed MS-Contin and Percocet for pain management. R. 538.

### B. Migraines

Malone has a history of migraines dating back to her slip-and-fall incident on June 6, 2000, when she lost consciousness and suffered a seizure. R. 295. The following day, Malone was evaluated by Dr. James Otis for severe headaches and seizure. R. 288. An EEG revealed no abnormalities. R. 288.

On September 14, 2012, Malone sought treatment from Dr. Ostrander, reporting headaches that were "under moderately acceptable control" with Tylenol with codeine. R. 455. However,

when Malone was evaluated by Social Worker Judith Bello at Boston Medical Center two weeks later, Malone reported headaches and rated the intensity of her pain as eight out of ten. R. 500.

On October 4, 2012, Malone sought urgent care from Dr. Jordana Meyerson and reported "a headache that is not alleviated by Tylenol with codeine." R. 469.

On November 14, 2012, Malone sought psychological treatment at Boston Medical Center and noted head pain of an eight out of ten on the pain scale. R. 424. Malone reported that her pain medication had recently been changed from Tylenol with codeine to codeine. R. 425. During Malone's next psychotherapy appointment on December 19, 2012, Malone reported "intense migraines" at a severity of ten out of ten. R. 464-65.

On January 9, 2013, during a therapy appointment with Psychotherapist Freeman, Malone reported constant head pain at a severity of four out of ten. R. 417.

On February 25, 2013, as described above, Malone reported a headache to Dr. Ostrander. R. 429-30. Malone was diagnosed with Chronic Pain Syndrome and prescribed Fentanyl pain patches. R. 431.

## C. Arthritis

On December 15, 2004, Malone sought treatment for difficulty straightening her finger to full extension. R. 305. Dr. Andrew Stein opined that she had a reflex inhibition

stemming from residual pain from a past laceration. R. 305. On June 22, 2005, Malone returned for a follow-up appointment, where she reported no pain in her finger but reported "a droop when she tries to fully straighten it." R. 306. Dr. Stein indicated Malone could make a fist without difficulty and maintain full extension for approximately ten seconds, at which point her finger joint begins to "droop to approximately 10 degrees." R. 306. Dr. Stein indicated that Malone had a partial EDC tendon injury, but that with time and exercise it was possible she would hopefully be able to "maintain the long finger in full extension." R. 306.

On June 12, 2007, Dr. Stein diagnosed Malone with chronic partial EDC tendon laceration and performed a delayed primary repair of the EDC tendon. R. 313. A follow-up appointment with Dr. Stein on July 9, 2007 revealed the finger was "well healed." R. 315. A "slight PIP lag" was identified and exercises recommended. R. 315.

On August 22, 2007, Malone was again seen by Dr. Stein, with increased functioning in her finger and no complaints of pain. R. 317. However, Dr. Stein noted that Malone "still is not satisfied with the PIP extension." R. 317.

## II. **Mental Health Conditions**

Malone's psychological symptoms are documented throughout her medical record and predate her alleged date of onset of

August 28, 2011. Her psychiatric diagnoses include post-traumatic stress disorder, bipolar disorder, depressive disorder, and substance abuse. R. 321, 445, 487. Malone's earliest documented complaints of psychiatric illness date back to January 22, 1998, when she was prescribed the antidepressant Amitriptyline. R. 273.

On August 21, 2006, during a surgical visit for hernia repair, Malone was described by Dr. Andrew Glantz as "hostile," "argumentative," and "threatening to ALL staff members." R. 309. On September 25, 2006, during a follow-up visit at the same clinic, Malone was described as "quite nasty and rude to all the nursing an[d] resident staff." R. 311.

During an appointment on June 25, 2008 with Dr. Kathleen Crowley in primary care, Malone reported pain and inability to sleep. R. 321. Dr. Crowley opined that Malone's pain symptoms were "exacerbated by lack of sleep and anxiety." R. 322.

On September 28, 2012, Malone received a behavioral health evaluation by Social Worker Bello at Boston Medical Center. R. 499. Malone reported "feeling increasingly overwhelmed, sad, and anxious." R. 499. Malone reported that "there are some days she does not want to get out of bed and will just cry all day." R. 499. Additional symptoms included symptoms of hopelessness, social withdrawal, isolation, feeling overwhelmed, and increased difficulty managing her temper. R. 499. Thoughts of suicide were

also noted. R. 505. The evaluation revealed that Malone had held numerous jobs but "cannot keep a job longer than 6-12 months because she starts to get overwhelmed and anxious." R. 502.

Following a psychotherapy appointment on November 14, 2012, therapist Freeman noted, "[Patient] is experiencing major depression." R. 425. Freeman noted that Malone displayed a loss of interest in pleasurable activities, withdrawal from relationships, decreased concentration, decreased appetite, and sleep disturbances. R. 425. Freeman diagnosed Malone with bipolar disorder not otherwise specified, post-traumatic stress disorder, and major depressive disorder, unspecified. R. 425. Following a psychiatric evaluation by Dr. Anna L. Fitzgerald on the same date, Malone was described as "dysphoric" and "very depressed" with "prominent insomnia." R. 440. Psychiatric medications at the time included Lamictal. R. 426.

Malone was seen for psychotherapy on December 5, 2012. R. 412. Malone reported emotional pain of nine on a scale of ten. R. 412. Malone's psychiatric medications were changed to Remeron. R. 414. On December 19, 2012, Freeman noted that Malone reported feeling "sad, depressed, and lonely the majority of the time" and "does not appear to believe her situation or her mood can improve." R. 465. Malone continued to experience symptoms of depression during psychotherapy appointments on January 9, 2013 and January 16, 2013. R. 417, 450.

At a January 30, 2013 appointment with Freeman, Malone reported emotional pain of a ten out of ten. R. 435. Malone was described by Freeman as "tearful and sad" throughout the therapy. R. 436. Malone's symptoms of depression continued during therapy sessions on February 20, 2013, February 27, 2013, and March 27, 2013. R. 445, 459, 480.

On April 24, 2013, Malone was seen by Dr. Fitzgerald. R. 484. Malone reported that therapy "has been very helpful" and "mood is much better." R. 484. Dr. Fitzgerald concluded: "depression improved" and "anxiety stabilizing." R. 487.

Throughout Malone's therapy, her global assessment of functioning (GAF) was generally designated a fifty on a scale of zero to one hundred, signifying serious impairment in functioning. R. 488, 496, 505. But see R. 405 (reflecting a GAF of 58).

## III. State Agency Medical Consultants' Evaluations

On November 26, 2012, Dr. Debra Rosenblum of the Massachusetts Rehabilitation Commission Disability Determination Services conducted a psychiatric examination of Malone to determine her eligibility for disability benefits. R. 402. Dr. Rosenblum described Malone as being in a "moderate amount of physical pain throughout the evaluation." R. 404. Dr. Rosenblum noted that Malone "writh[ed]" in her chair and had difficulty getting in and out of her chair. R. 404. Dr. Rosenblum indicated

11

that Malone reported symptoms of decreased sleep, increased irritability, constant racing thoughts, appetite problems, panic attacks, flashbacks, nightmares, difficulty focusing, decreased mood, and tearfulness. R. 405. Dr. Rosenblum described a "long-standing history of mental health issues originating in childhood trauma" with possible "genetic coding for mood disorder." R. 405. Dr. Rosenblum cited "significant mood and anxiety symptoms" and diagnosed Malone with bipolar disorder and post-traumatic stress disorder. R. 405. Dr. Rosenblum documented chronic pain and medical issues. R. 405. Dr. Rosenblum designated a global assessment of functioning (GAF) of 58, consistent with moderate symptoms or moderate difficulty functioning. R. 405. Dr. Rosenblum noted that Malone's prognosis was "poor." R. 405.

On December 3, 2012, state agency psychologist Dr. Nancy Keuthen evaluated Malone for disability benefits. R. 75. Dr. Keuthen found moderate limitations in Malone's ability to maintain concentration, to perform activities within a schedule, to maintain regular attendance, and to work in coordination with others. R. 73. Dr. Keuthen concluded that Malone would do best in a more isolative work environment with a "supportive employer." R. 74.

Malone was also examined on January 17, 2013 by Dr. Roger Komer on behalf of Massachusetts Rehabilitation Commission

Disability Determination Services. R. 408. Dr. Komer indicated that Malone carried a diagnosis of moderately severe bipolar disorder dating back fifteen years. R. 410. Symptoms of anxiety and moderate insomnia were also noted. R. 410. Dr. Komer noted that Malone reported depression and noted that "the symptoms of depression and anxiety have been stable for the past two years." R. 408.

Dr. Komer reported coccydynia, with Malone reporting pain following a fall two years prior. R. 410. During the examination, Malone reported a slip and fall in 2011 with "continuous" pain since that time. R. 408. Malone further relayed that pain is more pronounced while sitting and during prolonged standing. R. 408. Mild obesity was documented. R. 409. Medications at the time of the examination were codeine (10 mg. daily), Remeron, Tylenol, and MiraLax. R. 409.

On May 24, 2013, state agency psychologist Dr. Kathryn Collins-Wooley evaluated Malone for disability benefits. R. 88. Dr. Collins-Wooley indicated that Malone was experiencing traumatic memories that were described as "a source of marked distress." R. 83. Daily living activities were "limited by physical pain." R. 88. Social functioning and concentration were deemed moderately impaired. R. 87. Dr. Collins-Wooley reported that Malone's "mood, anxiety and chronic pain would hamper task focus and pace." R. 87. Dr. Collins-Wooley deemed Malone

moderately impaired in her ability to accept instructions and criticism from supervisors and appropriately interact with coworkers. R. 87. It was further noted that Malone could be expected to sustain work tasks for "2-hr blocks during an 8-hr day in an unpressured work environment with few interpersonal challenges." R. 87. Dr. Collins-Wooley opined that Malone could interact "infrequently" with the public provided that tasks were predictable and routine. R. 87. However, it was noted that Malone would perform best in a more "isolative" work environment. R. 87. Finally, Dr. Collins-Wooley reported that Malone "could work for a supportive employer" but that she may miss one to three days of work per month due to difficulty getting out of bed. R. 87.

On June 12, 2013, state agency physician Dr. Jayant Desai evaluated Malone's physical condition as part of her Social Security disability determination. R. 82. Dr. Desai deemed Malone "partially credible" in her characterization of her symptoms based on past trauma to her coccyx, physical findings, and Malone's ability to shop for food. R. 84. Dr. Desai identified an exertional limitation of occasionally carrying fifty pounds, with twenty-five pounds acceptable for frequent carrying. R. 85. Dr. Desai determined that Malone was able to stand and walk for about six hours of an eight-hour workday with normal breaks. R. 85. Dr. Desai opined that Malone was able to

14

sit for a total of four hours with normal breaks permitted she could adjust posture and shift weight. R. 85. Pushing and pulling of objects was determined to be "unlimited." R. 85. No environmental or communication limitations were identified. R. 86. Based on Malone's history, Dr. Desai concluded that Malone was not disabled. R. 89.

On January 18, 2014, Dr. Peter Lindblad submitted an evaluation that Malone suffered from fibromyalgia and had some postural and manipulative limitations ("shoulder arm hand pain slight to grip"). R. 530-31. She could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit for eight hours in an eight-hour workday. R. 530. While the notes are hard to read, it appears Dr. Lindblad diagnosed her with "fibromyalgia diffuse tenderness upper and lower extremities motion intact." R. 531.

On January 29, 2014, state agency consultant Nurse Kathleen Dalton evaluated Malone to determine eligibility for Massachusetts state disability benefits. R. 519. Dalton identified several conditions that were of sufficient severity to limit Malone's ability to perform basic work activities. R. 520. These conditions included: fibromyalgia; headaches; pain in her back, hips, legs, shoulders, stomach, bowels, and shoulders;

bipolar disorder; post-traumatic stress disorder; and mood disorder. R. 520.

The Massachusetts Disability Evaluation Services declared Malone disabled on January 30, 2014 with the disability expected to last through December 30, 2014. R. 518.

## IV. Non-Treating Physician Consultative Evaluation

Dr. Frank Graf, a board-certified orthopedic surgeon, performed a consultative evaluation of Malone on June 3, 2014. R. 546. His review of Malone's medical record indicated that she was on numerous medications (like morphine and Percocet) for her "chronic pain requiring opiate management." R. 546. After examining Malone, Dr. Graf diagnosed her with "[c]hronic cervical and right upper extremity pain, numbness and tingling; chronic lumbosacral and right lower extremity pain, numbness and tingling; neurological disorder with abnormalities in gait and coordination." R. 552. He opined that the combined effects of Malone's medical conditions rendered her disabled for employment:

> This individual meets the criteria of musculoskeletal Listing 1.04 with involvement of cervical and thoracolumbar spine with right upper extremity and right lower extremity sensory and radicular pain patterning. She also has alterations in gait and station and cranial nerve findings including tongue fasciculations and loss of sense of smell, which with the problems of balance and maintaining gait and station are consistent with a diagnosis of multiple sclerosis. The

> combined effect of her chronic
> musculoskeletal pain, incisional wall pain
> for the abdomen and neurological findings
> render her disabled for all employment.

R. 552. On the Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Graf stated that she could occasionally lift and/or carry less than ten pounds, frequently lift and/or carry less than ten pounds, and stand and/or walk less than two hours in an eight-hour workday, and that pushing and/or pulling is limited in both the upper and lower extremities. R. 554). Dr. Graf also stated: "pain limits concentration and pace." R. 555.

## V.   Hearing Before the ALJ

### A.   Malone's Testimony

Malone testified before the ALJ on June 26, 2014. She reported the following ailments: "excruciating" hernia pain, "severe chronic pain" in the back of right leg, "severe" arthritic pain in her right hand, "debilitating" migraines twice per month, daily "functional" headaches, bronchitis, "severe" back problems, fibromyalgia with "chronic, widespread pain," depression, and anxiety. R. 35-40.

Malone testified that some days are worse than others. R. 45. Malone testified that on "worse" days, she has difficulty getting out of bed and will cry for several hours. R. 45. Malone testified that she is able to stand for five to ten minutes,

that she can walk for five minutes before needing to stop and rest, and that she can travel up and down stairs but must "grab to hold on and pull [her]self up." R. 44-45. She reported she can lift "[m]aybe a couple of pounds." R. 44-45. Malone indicated that she is able to load the washing machine on "good" days but that her family typically does the laundry. R. 41. When transported by her husband or youngest daughter, Malone is able to grocery shop. R. 40-41. Lastly, Malone testified she is able do light cooking, such as making toast. R. 41, 47.

## B. Vocational Expert's Testimony

The ALJ asked the vocational expert, Dr. Amy Versillo, to consider a hypothetical individual of Malone's age, education, and residual functional capacity with the following limitations: "capacity to perform work at the light range"; pain; depression; anxiety; at-times impacted concentration, memory, and attention; difficulty conforming to changes in work environment; inability to perform complex tasks; restrictions to one- to four-step repetitive tasks; no tandem tasks with co-workers; and only casual contact with the public with no providing or receiving of information. R. 50-51.

The vocational expert testified that a hypothetical individual with that description would be capable of performing light, unskilled jobs that are present in significant numbers in the national economy, including Small Product Packer and Sorter,

Production Labeler, and Bench Assembler. R. 52. With regard to the number of jobs with a "supportive employer," the vocational expert testified that the term was subjective and not readily quantifiable. R. 56-57. When given a hypothetical of an individual with additional limitations of carrying less than ten pounds with standing and walking of less than two hours, the vocational expert indicated that the identified jobs would be precluded. R. 59.

The vocational expert also testified to the hypothetical employability of an individual who required additional absences or extra breaks. R. 53-55. The vocational expert indicated that missing more than one day a month as an employee in one of the identified jobs would be "so substantially above average that's not going to be tolerated." R. 55. The vocational expert further testified that employment would be precluded if the individual exceeded the designated breaks of five to ten minutes per two hours of work and a thirty- to forty-minute lunch break. R. 53-55. Lastly, the vocational expert testified that it would not be tolerable for a person in the above roles to consistently be off task for greater than six minutes per hour. R. 54-55.

## VI. Decision of the ALJ

The ALJ issued his decision on July 24, 2014. The ALJ concluded that Malone was not disabled R. 10-21. At step one of his analysis, the ALJ found that Malone had not engaged in

"substantial gainful activity" since August 28, 2011. R. 12. At step two, the ALJ concluded that Malone had the following severe impairments: coccydynia, hernia, fibromyalgia, depression, and anxiety. R. 12. The ALJ concluded that Malone's migraines, right hand arthritis, and obesity were not severe impairments. R. 12.

At step three, the ALJ found that Malone did not have an impairment or combination of impairments that met the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 13. The ALJ indicated that Malone's coccydynia did not meet the requirements of Listing 1.04, disorders of the spine. R. 13. The ALJ concluded that Malone's mental impairments did not meet the requirements of Listing 12.04, affective disorders, or Listing 12.06, anxiety-related disorders, due to failure to establish "marked restriction[s]" in at least two domains. R. 13. The ALJ concluded that Malone had only "mild" restrictions in daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of extended decompensation. R. 13-14.

At step four, the ALJ evaluated Malone's residual functional capacity. R. 15-19. As to physical capacity, the ALJ found that "[Malone]'s treatment and physical health revealed essentially mild findings throughout" and that as such, she had the ability to perform "light work." R. 15, 17.

In arriving at this conclusion, the ALJ gave "great weight" to the state agency medical consultants' determination that Malone was capable of performing light work. R. 17. The ALJ gave "some weight" to Dr. Cottrell's[1] opinion that Malone could do light work with additional postural and push/pull limitations, finding the limitation to light work reasonable but finding no support for the additional postural limitations "in light of the generally normal physical examinations, exhibited normal strength in all extremities and conservative treatment." R. 17.

The ALJ gave "little weight" to examining consultative orthopedist Dr. Graf's opinion that Malone met criteria for musculoskeletal Listing 1.04, disorders of the spine. R. 17. He also gave little weight to Dr. Graf's opinion as to her residual functional capacity. The ALJ noted (twice) that Dr. Graf's examination was conducted "solely for the purpose of rendering an opinion in support of this case" and that this "impacts the credibility and relevance of his opinions." R. 17. The ALJ also described Dr. Graf's findings as "inconsistent with the medical evidence of record." R. 17.

---

[1]     It appears that the ALJ mistakenly referred to Dr. Lindblad as Dr. Cottrell. The page in the record that the ALJ refers to as Dr. Cottrell's opinion, "Exhibit 10F, 13," is actually an evaluation conducted by Dr. Lindblad. R. 530; see also R. 522 (referring to RFC physical by Dr. Linblad").

As to psychiatric impairments, the ALJ found that the record supported diagnoses of depression, anxiety, post-traumatic stress disorder, and a rule-out of bipolar disorder. R. 18. But the ALJ found that Malone's psychiatric diagnoses were not "as limiting as alleged." R. 18.

In reaching this conclusion, the ALJ cited the November 26, 2012 psychiatric evaluation conducted by Dr. Debra Rosenblum for the Massachusetts Rehabilitation Commission Disability Determination Services. R. 18. This evaluation documented a global assessment of functioning ("GAF") of 58, consistent with "moderate symptoms or difficulty functioning." R. 18. The ALJ also considered a September 2012 mental health evaluation where Malone presented as appropriately dressed, well groomed, alert, attentive, cooperative, and engaged. R. 18. The ALJ also noted that Malone had voluntarily terminated treatment and lapsed in her medication. R. 18. The ALJ reasoned: "It is reasonable to conclude that an individual with the alleged mental limitations would not be able to go off medications and abstain from mental health treatment without incident." R. 18.

The ALJ gave "some weight" to Malone's treating clinician's opinion that Malone had "some impairments in social interactions." R. 19. The ALJ reasoned that the medical record supported the treating clinician's finding of social interaction

limitations, as Malone's therapy sessions emphasized her past and present troubled relationships. R. 19.

The ALJ gave "limited weight" to the evaluations of state agency medical consultants Dr. Keuthen and Dr. Collins-Wooley. R. 19. The ALJ reasoned that the medical consultants did not have access to more recent medical evidence and that the opinion of Malone's treating clinician was "more consistent with the record as a whole." R. 19.

In light of that analysis, the ALJ determined Malone's residual functional capacity to be the following:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is able to perform 1-4 step repetitive tasks; she is able to work with and without supervision; she can work with coworkers, but work may not involve tandem tasks; she is able to have casual, basic interaction with the general public that does not involve providing or receiving information as part of the job description.

R. 15.

Based on Malone's residual functioning capacity, the ALJ found at step four that Malone was unable to perform any of her past relevant work as a residential counselor or certified nurse's aide. R. 19.

At step five, the ALJ assessed whether Malone could perform other jobs in the national economy. Citing the testimony of a

vocational expert, the ALJ concluded that Malone was capable of performing jobs that are present in significant numbers in the national economy, including Small Product Packer and Sorter, Production Labeler, and Bench Assembler. R. 20-21. Thus, the ALJ determined that Malone was not disabled under the Social Security Act. R. 21.

## VII. **Procedural History**

Malone filed her application for Social Security disability benefits on August 14, 2012, alleging a disability onset date of August 28, 2011. R. 64, 179. Malone's application was initially denied on January 25, 2013. R. 76. Malone's request for reconsideration was denied on July 15, 2013. R. 104. On June 26, 2014, an administrative hearing was held before the ALJ. R. 10. On July 24, 2014, the ALJ issued the unfavorable decision described above in Part VI. R. 21.

The Appeals Council denied Malone's request for review on September 24, 2015. R. 1. Malone now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g). Docket No. 1.

DISCUSSION

## I. **Legal Standards**

### A. **Standard of Review**

The ALJ's factual findings are entitled to deference. "We must affirm the [ALJ's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported

by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); see also Libby v. Astrue, 473 F. App'x 8, 8 (1st Cir. 2012) (per curiam); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). A finding is supported by substantial evidence "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

"Even in the presence of substantial evidence, however, the Court may review conclusions of law, and invalidate findings of fact that are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Rascoe v. Comm'r of Soc. Sec., 103 F. Supp. 3d 169, 175 (D. Mass. 2015) (quoting Musto v. Halter, 135 F. Supp. 2d 220, 225 (D. Mass. 2001)); see also Goncalves v. Astrue, 780 F. Supp. 2d 144, 146 (D. Mass. 2011).

### B. Statutory and Regulatory Framework

A claimant seeking benefits under the Social Security Act must prove that he or she is disabled. 42 U.S.C. § 423(a)(1)(E). To qualify as disabled, a claimant must show "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which

has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). To meet this definition, a claimant must "have a severe impairment(s)" that renders the claimant "unable to do [their] past relevant work or any other substantial gainful work that exists in the national economy." 20 C.F.R. § 404.1505(a).

The ALJ employs a five-step sequential evaluation process to evaluate a claim for disability benefits. Id. § 404.1520(a). If the ALJ determines at any step that the claimant is disabled or not disabled, the evaluation may be concluded at that step. See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

In the first four steps, the claimant bears the burden of proof to establish disability. Freeman, 274 F.3d at 608. On step

five, the burden shifts to the Commissioner. <u>Arocho v. Sec'y of Health and Human Servs.</u>, 670 F.2d 374, 375 (1st Cir. 1982).

## II. **Analysis**

Malone challenges the ALJ's residual functioning capacity determination on two grounds. First, Malone contends that the ALJ improperly rejected the opinion of Dr. Graf with regard to her physical disability. Second, Malone argues that the ALJ erroneously failed to account for her need for a "supportive employer."

### A. **Dr. Graf's Opinion**

Social Security Administration regulations set out factors that determine the weight the ALJ should give to a medical opinion. The listed factors are: (1) whether there is an examining relationship; (2) whether there was a treatment relationship and the length and nature of the treatment relationship; (3) the extent of evidentiary support for the opinion; (4) the consistency of the opinion with the overall record; (5) the specialization of the source; and (6) other relevant factors such as the source's knowledge of the overall case and medical record. 20 C.F.R. § 404.1527(c)(1)-(6).

Malone argues that the ALJ gave insufficient weight to the opinion of Dr. Graf, an orthopedic specialist who physically examined Malone at the request of attorneys in connection with Malone's disability benefits application. Dr. Graf also reviewed

27

numerous medical records dating back to 1990. Dr. Graf documented his findings in a typed report dated June 3, 2014. R. 546-52. Dr. Graf concluded that Malone was disabled because her physical conditions met the criteria for musculoskeletal Listing 1.04, disorders of the spine. R. 552. He also assessed her limitations in a RFC form. R. 553-54.

While Dr. Graf did not have a treatment relationship with Malone and only saw her once, at least three factors supported giving weight to Dr. Graf's opinion. He is a specialist in orthopedic surgery, he physically examined Malone, and his thorough typed report demonstrated extensive knowledge of Malone's medical record. The ALJ nonetheless gave "little weight" to Dr. Graf's report for two reasons. First, he emphasized by stating twice that "Dr. Graf examined the claimant solely in the context of this claimant for benefits, which impacts the credibility and relevance of his opinions." R. 17. Second, "his clinical findings and opinions are inconsistent with the medical evidence of record. (Exhibit 14F)." R. 17.

The ALJ provided insufficient reasons for discounting Dr. Graf's report. As to the first reason, the First Circuit has stated: "In our review of social security disability cases, it appears to be a quite common procedure to obtain further medical reports, after a claim is filed, in support of such a claim. Something more substantive than just the timing and impetus of

medical reports obtained after a claim is filed must support an ALJ's decision to discredit them." Gonzalez Perez v. Sec'y of Health & Human Servs., 812 F.2d 747, 749 (1st Cir. 1987) (per curiam); see also Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) ("[T]he mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report."); Rodriguez v. Astrue, 694 F. Supp. 2d 36, 44 (D. Mass. 2010).

The second reason, inconsistency with the medical record, can be a valid reason to discount a medical report. See 20 C.F.R. § 404.1527(c)(4) (listing consistency with the overall medical record as a factor to be used to determine the weight to give to a medical opinion). But the ALJ's explanation of the inconsistency was nothing more than a citation to Exhibit 14F, which is sixty-five pages of hospital records from Boston Medical Center dated May 1, 2013 to February 7, 2014. A review of the extensive medical record, however, indicates that Dr. Graf's opinion is consistent with much (not all) of the record. The records covered numerous office visits documenting a multi-year history of neck and back pain, fibromyalgia and extensive pain medication. For example, there were extensive reports of chronic pain in the record. See, e.g., R. 584, 592, 615, 618. Further, Malone has been on numerous pain medications, including

Fentanyl, Morphine, Codeine, and Percocet, and yet indicated that the medications did not adequately relieve her pain. R. 587, 596. The State Disability Evaluating Service gave her benefits even though it also found her capable of performing "light work."[2] R. 522. Her treating physician, Dr. Cottrell, concluded that she was disabled because of physical limitations. R. 542.

The ALJ gave greater weight to the RFC of Dr. Peter Lindblad,[3] a physician Board-certified in internal medicine. R. 17. But while the record is not crystal clear, it appears that unlike Dr. Graf, Dr. Lindblad did not physically examine Malone. To be sure, as the government points out, the record sometimes reports Malone as doing well without significant issues, see, e.g., R. 474, and as having normal gait and mobility. But the ALJ failed to point to what specifically in the medical record was so inconsistent with Dr. Graf's opinion that he would give Dr. Graf's opinion less weight than that of a non-examining state medical consultant. The ALJ gave an inadequate explanation of the decision. See Taylor v. Astrue, 899 F. Supp. 2d 83, 88–89

---

[2]    Because this issue was not mentioned by the ALJ or sufficiently briefed by the parties, the Court has an inadequate basis for understanding why the claimant received state benefits.

[3]    As explained in footnote 1, the ALJ's decision mistakenly referred to Dr. Lindblad as Dr. Cottrell.

(D. Mass. 2012) ("[The ALJ] must adequately explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence."); Crosby v. Heckler, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("The ALJ cannot reject evidence for no reason, or for the wrong reason, and must explain the basis for his findings. Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation.").

The ALJ's decision to give little weight to Dr. Graf's opinion but greater weight to a non-examining physician was error in light of the failure to identify specific inconsistencies in the medical record.

## B. "Supportive Employer"

Malone's second contention is that the ALJ erred in not accounting for Malone's need for a "supportive employer" in the residual functioning capacity analysis. At the hearing, the ALJ gave the vocational expert an appropriate hypothetical that reflected Malone's pain, depression and anxiety and resulting deficits in concentration and ability to work with co-workers. R. 50-51. However, Malone faults the ALJ for not putting the need for a supportive employer in his hypothetical to the vocational expert.

While it is correct that both state agency medical consultants stated that Malone "could" work for a supportive employer, R. 74, 87, the term "supportive employer" is ambiguous. As the vocational expert testified: "[T]here's no way to control for, or to look at job numbers and say this percentage of supervisors or manufacturers, are supportive." R. 57. To conduct the step four and step five analyses and determine how many jobs meet a claimant's physical and mental needs, there must be concrete and definable vocational limitations. See Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000) (stating that hypothetical question posed to vocational expert must "capture[] the concrete consequences of a claimant's deficiencies"). The ALJ's residual functional capacity accounted for other, more specific moderate mental and social limitations that the doctors had identified. The failure to include the "supportive employer" term in the residual functioning capacity and in the hypothetical presented to the vocational expert does not constitute error.

## ORDER

For the reasons stated, Malone's motion to vacate and remand (Docket No. 19) is **ALLOWED**. The Commissioner's motion to affirm (Docket No. 20) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge